ANGUS K. FAIRLY et al., Administrators, &c. *v.* MATTHEW W. FAIRLY.

1. DEED: GIFT: CONSIDERATION OF ONE DOLLAR: CASE IN JUDGMENT.—A deed which, "in consideration of natural love and affection, and of one dollar," conveys all the grantor's interest in a deceased person's estate, is sufficient to divest the grantor of all interest in the estate, real and personal, without a delivery of possession; and so, if the consideration of one dollar recited in it, be shown not to have been paid. See *Fairly* v. *Fairly*, 34 Miss. R. 18.

2. WITNESS: ERROR OF COURT IN DECIDING WITNESS INTERESTED, NOT CURED BY ADMITTING HIM TO TESTIFY AS AN INTERESTED WITNESS.—A party offering a disinterested witness, is entitled to his testimony as such,—exempt from the liability to be discredited by the jury, to which the testimony of an interested witness is subject; and hence, if the court erroneously decide that a witness is interested in the result of the suit, the error will *not* be cured by admitting the witness to testify as an interested person, under the provision of Art. 190, p. 510, of the Revised Code.

3. WITNESS: EVIDENCE: RULE IN RELATION TO PARTY'S IMPEACHING HIS OWN WITNESS.—The party introducing a witness may contradict him, as to material facts stated by him, by calling other witnesses to prove the contrary; for the object of such testimony is not to impeach or discredit the witness, though that may be its incidental and consequential effect. But it is well settled that a party cannot introduce general evidence to impeach his own witness; and for the same reason, he cannot discredit him, by asking him, on a re-examination, if he is not interested in the result of the suit.

4. EVIDENCE: ANCIENT DOCUMENT: RULE IN RELATION TO.—That an instrument merely bears date thirty years before its production in evidence, is not sufficient to bring it within the rule which admits as evidence ancient documents, without proof of their execution; but the existence of the deed for thirty years must be shown by proof *aliunde*; this may be done, however, by proof of circumstances creating the presumption of execution, as by proof of its possession

Fairly et al. Admrs. *v.* Fairly.

by the party claiming under it, for thirty years, or by proof of possession of property conveyed by it for that period.

5. PRINCIPAL AND AGENT: TRUSTS: NAKED LEGAL TITLE OUTSTANDING IN PERSONALTY NO BAR TO ACTION AT LAW.—Where a slave is purchased by an agent with the funds of the principal, expressly for his use, the latter may maintain an action at law, to recover possession of the slave from the former, notwithstanding the naked legal title may be vested in the trustee, by reason of his having fraudulently taken the title to the slave in his name. See *Mitchell v. Mitchell,* 35 Miss. R. 108.

6. SAME: NAKED LEGAL TITLE IN PERSONALTY, WHEN CONVEYED BY DELIVERY OF THE PROPERTY.—If an agent purchase a slave with the funds of the principal and for his use, and afterwards deliver possession to the principal, a naked legal title vested in the agent, at the time of the purchase, will be thereby fully vested in the principal.

7. JURY: INSTRUCTION: COURT MUST CONSTRUE WRITINGS.—It is error to leave to the jury, by instructions from the court, the construction of a written instrument introduced in evidence.

8. INSTRUCTIONS: MUST BE PERTINENT AND RELEVANT.—Instructions to the jury must be not only abstractly correct, but they must also be pertinent and relevant to the evidence.

9. SAME: SAME: CASE IN JUDGMENT.—Where a hypothetical case is stated in, and made the basis of an instruction to the jury, it should be stated fully, without omission of material facts, as the evidence tends to re-establish it in relation to the particular point involved in the instruction, and the rule of law should be correctly expounded in reference to the case thus stated; and hence, in an action of detinue for the recovery of a slave, if the evidence tend to show, that the slave was purchased by the defendant in his own name, but with the funds and for the use of the plaintiff, and that the defendant as his agent afterwards managed and controlled the slave, it will be error to instruct the jury, that if the defendant purchased the slave, and took the legal title to himself, and afterwards held possession, they must find for him, without stating, also, that it was necessary that the possession of defendant should have been accompanied by a claim of property in himself, and for a period sufficient to bar the plaintiff's title by the Statute of Limitations.

10. PRINCIPAL AND AGENT: HOW PRINCIPAL AFFECTED BY ACTS OF AGENT SETTING UP TITLE TO HIS PROPERTY.—If an agent, after purchasing a slave with the funds, and for the use of the principal, hire out the slave and receive the wages therefor, with the knowledge and consent of the principal, this is not a circumstance tending to show title in him, unless it also appear that he claim to do so in his own right, and with the knowledge of the principal.

11. INSTRUCTIONS: FRAUD: RECORDING OF BILL OF SALE.—The recording of a bill of sale to a slave, by the vendee, is a circumstance, which the jury may consider, with all the other evidence in the case, and to be weighed with it, in determining the *bona fides* of the vendee's title, but it is not a matter which

the court is authorized to charge the jury, is evidence of fraud, or is not evidence of fraud.

ERROR to the Circuit Court of Jackson county. Hon. William M. Hancock, judge.

This was an action of detinue by the administrators of Margaret Fairly to recover possession of two slaves,—Cæsar and Calvin. Pleas, not guilty, and the Statute of Limitations. The defendant was a son and heir of Archibald Fairly, deceased. The plaintiffs claimed title to Calvin, as the issue of a slave Nancy, which they alleged belonged to their intestate. They claim title to Cæsar, alleging, that he had become the property of the intestate on the division of the mother's estate.

It was shown that the slave Nancy had several children, which had been divided among, and were possessed by, the children of Archibald Fairly. Suits were pending for the recovery of all these, and by consent of the parties they were all tried with this.

On the trial plaintiffs introduced as a witness, John Fairly, who was a brother of plaintiffs' intestate, and one of her heirs. He was objected to by the defendant on the ground of interest. Plaintiffs then exhibited a deed made by the witness, by which "for and in consideration of natural love and affection and of one dollar to him in hand paid," he gave, granted, and released to his children and grandchildren, "all his right, title, and interest, in any and every right or claim, which he has, in and to all and every part of the property of his sister Margaret Fairly, deceased, both at law and equity." Upon being interrogated by the defendant, the witness admitted, that he had executed this deed, that he might be a witness in the case, and that the consideration of one dollar therein mentioned was never in fact paid. The court decided, that the deed did not divest the grantor of his interest in the result of the suit, but permitted him to testify as an interested witness, under the provisions of the Revised Code; and the plaintiffs excepted.

The witness then stated, that he and his brother Archibald, and his sister Margaret, all formerly resided in North Carolina, where their father and mother lived and died; that upon the distribution of his father's estate, a sum of money was due to his sister Margaret,

as her share in the estate; that she gave this money to Archibald Fairly, who went to Virginia to buy a negro with it, for her; that soon after Archibald's return from Virginia, with the girl Nancy, he stated, that he had bought a negro for Margaret, and he had run away; he sold him and bought another, and he also ran away, and he therefore sold him, and with the proceeds he bought the girl Nancy. That Archibald afterwards repeatedly spoke of the girl Nancy as the property of Margaret; that Margaret and Archibald, after their father's death, resided with their mother until she died, some ten or twelve years ago, and that after their mother's death, Margaret continued to reside with Archibald, and very soon thereafter removed with him to Mississippi; that in North Carolina Margaret owned land, and her negroes worked it; that she owned no land in this State, and her slaves worked on Archibald's land, who generally managed her business; that Margaret always claimed Nancy and her issue as her own, and that it was the common understanding in the family, that they were her property. That shortly after Margaret's death, which took place six or seven years ago, Archibald told witness he intended to divide her negroes among his children, and witness told him he had better not do so; that Margaret acquired Cæsar, on a division of her mother's estate.

Cross-examined. The witness stated that he had removed from North Carolina to this State in the year 1821, and had visited that State only once since; that after Margaret and Archibald removed to this State, they visited witness very seldom.

Plaintiff then introduced David Berry, and proved by him the names and ages of Nancy's children, and that some of them were in the possession of each of the children of Archibald Fairly.

On cross-examination, this witness stated, that he knew Archibald Fairly's family fifteen years, and had removed with them from North Carolina to this State; that Archibald had the slaves in possession during his lifetime, and "seemed to control them; he hired them out, and received their wages; never heard Margaret claim them, and don't recollect to have heard it stated by any one, that they were hers.

The plaintiff then asked this witness if he were not interested in the result of this suit. Defendants objected to the question; this objection was sustained, and plaintiff excepted.

Plaintiffs then proved by one witness, that about a year before said Margaret's death, he went to see Archibald about hiring Cæsar; and Archibald told him to go to his sister Margaret, as she controlled him herself; that he, Archibald, could hire him Calvin, or Amos (Nancy's children); that they belonged to Margaret, but that he controlled them.   Another witness, who was a relative, (a cousin) of both parties, stated : that a year or two before Margaret's death, she requested witness to carry Cæsar to Mobile and hire him out, which witness did; that she claimed Cæsar as her own; but he does not know whether she claimed the others or not.   " It was the common understanding, that a portion of the slaves in Archibald's possession, were Margaret's."   Another witness stated, that a short time after Margaret's death, Archibald came to witness's house and stated that he had divided his sister Margaret's negroes among his children, and that such was her request.   Another witness stated that Archibald said he was going to divide the negroes of his sister Margaret among his children.

The defendant then offered in evidence a bill of sale under seal, purporting to be made by William Pollock, and to convey the girl Nancy to Archibald Fairly for the sum of $400, and dated 25th July, 1818.   On it appeared the name of two attesting witnesses. There was indorsed on it : " Filed for record and recorded in my office, July 5th, 1853.   S. Davis, clerk of Probate Court of Jackson county, Mississippi."

In support of the deed, plaintiff proved by S. Davis, that shortly after Margaret Fairly's death, Archibald Fairly offered the instrument to him for record, and that he recorded it.

James Fairly (a son of Archibald, and a defendant in one of the suits) testified, that ever since his mother's death, which took place sixteen or seventeen years ago, his father's papers were kept in a trunk, of which his aunt Margaret kept the key.   Margaret had access to the trunk, and could read and write.   That she and his father lived together; and after his mother's death, she superintended matters about the house.   He never heard of her claiming any of the negroes; they were in his father's possession, and he hired them out, and received the pay therefor.   Witness first saw the bill of sale about eighteen years ago.   Witness's father owned the place in North Carolina in which he and Margaret lived, and

she never claimed any interest in it. Witness found the bill of sale in the trunk before mentioned after his father's death. Witness's grandmother died eleven years ago, without any property. Cæsar was born his father's; was the child of Elva, who came to his father from witness's grandfather's estate, and had been owned by his father ever since witness could recollect.

Cross-examined. Witness stated he was thirty-two years old; that he never knew his aunt Margaret to have any property or money, and "don't think she ever controlled any of the negro property;" and that he, witness, had always lived with his father until his death.

Upon this proof, the court permitted the bill of sale to be read, and the plaintiff excepted.

John Fairly, for defendant, stated : that he had had two conversations with Archibald Fairly respecting the negroes in controversy, in which his statements were directly contradictory. In the last conversation, Archibald said that the negroes were his, and he had a bill of sale for Nancy, and had paid taxes for them, and they were in his possession.

Cross-examined. In the first conversation, said Archibald said, " he had divided, or would divide (witness does not remember which) his sister Margaret's negroes or property (don't recollect which), among his (Archie's) children." This conversation took place soon after Margaret's death.

Matthew Fairly, the defendant, testified, that he is twenty-eight yeas old, and lived with his father till his death. His father hired out the negroes in controversy, and received the wages; never heard his aunt Margaret claim them, and never heard of her claiming any property here or in North Carolina, and she never cultivated a farm or carried on any business, either here or in North Carolina, and he never heard his father's title questioned.

Cross-examined. Witness does not recollect to have heard either his father or his aunt say anything in relation to the title of the property. His father had other slaves besides that in controversy. After his aunt's death his father divided Cæsar and the children of Nancy among his children ; he divided no other property among his children.

Defendant also proved by two witnesses that each of them had assessed the property in controversy, and that it was assessed as

Archibald Fairly's; and on one occasion Margaret was present when this was done, and made no objection.

The instructions given and refused, which were made the subject of an assignment of errors in this court, are fully stated in the opinion.

The verdict was for the defendant, and plaintiffs moved for a new trial, which being refused, they sued out this writ of error.

*George Wood*, for plaintiffs in error.

1. John Fairly was a disinterested witness. The deed executed by him fully divested him of all interest in the estate. *Fairly* v. *Fairly*, 34 Miss R. 18.

2. The question propounded to witness Berry, which sought to show that he was interested, was competent. The rule only extends to the prevention of a party's introducing general evidence to impeach his own witness.

3. The bill of sale was improperly admitted. Proof of the execution of ancient deeds is dispensed with, but they must be shown to be ancient, otherwise than by their date. 1 Greenl. Ev. § 171; 2 Phil. Ev. Cow. and Hill & Edward's notes, p. 478.

4. The court erred in refusing the instructions asked by plaintiffs. They were strictly correct and applicable to the evidence; and the instructions given for defendant were erroneous, and calculated to mislead the jury.

*W. P. Harris*, for defendant in error,

Insisted that it was well settled that there may be a legal and an equitable title in slaves, and that in respect to them, there may be a naked legal title outstanding, which a court of law is bound to protect. Here the legal title was in defendant, and the verdict was on that ground correct. *Moody* v. *Farr's Lessee,* 33 Miss. R. 209; *Presby* v. *Rogers*, 24 Ib. 520. It is true that a writing is not essential to convey the legal title to the equitable owner, but its conveyance in some form ought to be distinctly proven, to enable a court of law to give him relief. The proof is clear that the legal title is in Archibald, and the resulting trust attempted to be set up in favor of Margaret, depends upon the most uncertain of all kinds of evidence,—the declarations of a party made long anterior to the

trial; and the evidence in relation to these is contradictory. It seems clear that Margaret knew that Archibald had the legal title, and she never complained of it, or attempted to enforce her alleged equity; on the contrary, it is manifest she permitted her brother not only to hold the legal title, but to enjoy the beneficial interest in the slaves, and directed him to convey it to his children. This direction is as competent to rebut the resulting trust, as the parol admissions of Archibald are to establish it.

Possession of property ought not to be disturbed, unless upon very satisfactory evidence of title in the party assailing it, especially when that possession has continued for years, and is protected by a legal title shown to have existed at some time, and no evidence that it has been distinctly surrendered.

The evidence here goes to this point only,—that certain declarations of Archibald Fairly, about which the evidence is conflicting, leads to the supposition that he held the legal title in trust for Margaret, and that Margaret had consented that he should hold it for his children. In a court of law, taking cognizance only of the legal title, this was clearly insufficient.

The testimony of two of the defendants is direct and positive that Cæsar was the descendant of Elva, who belonged to Archibald, and had always been in Archibald's possession. If the jury believed this evidence, they were bound to find for the defendant as to Cæsar.

Indeed, from the character of the case, the position of the witnesses, the uncertainty which long lapse of time and failing memory and the bias of interest throw over these facts, with but one distinct, undoubted fact existing, to wit, continued possession, with written evidence of title in Archibald, the verdict ought not to be disturbed.

The instructions—take all that were given—there was sufficient to guide the jury properly; take those refused, and there was nothing withheld which could have enlightened them.

The result seems to be right. Where from fifteen to twenty instructions are presented to be acted on, errors in the abstract are committed, always, we may say; but no errors here which substantially affected the merits of the case.

HANDY, J., delivered the opinion of the court.

This action was brought by the plaintiffs in error, as administrators of Margaret Fairly, deceased, to recover certain slaves, alleged to be the property of the intestate, in the possession of the defendant.

The questions presented for consideration here arise upon exceptions taken to the rulings of the court upon various points of evidence raised on the trial, to the rulings of the court upon the instructions to the jury asked by both parties, and to the overruling of the plaintiff's motion for a new trial. The errors assigned upon these points will be considered in their order.

The first error assigned is the ruling of the court that John Fairly was an interested witness. That witness was a brother of the plaintiff's intestate, and one of the distributees of her estate. But he had executed a deed releasing and conveying all his interest in the estate to his children and grandchildren; which was produced and shown on the trial. That conveyance was in no wise impeached; and it clearly divested him of all legal interest which he had in the subject-matter of the suit. It was, therefore, error to hold that he was interested in the suit. And this error was not cured by the ruling of the court, in permitting him to testify as a person interested in the suit, in virtue of the provision of the Rev. Code, 510, Art. 190; for, under the rule thereby established, he testified as an interested witness, and his testimony was liable to be received by the jury with whatever discredit they might think fit to attach to it on that account.

The second assignment is, the rejection of the question put by the plaintiffs to the witness Berry on re-examination, whether he was not interested in the suit. That witness was introduced as a witness in chief for the plaintiffs, and examined *as such*, and was then cross-examined by the defendant; after which the plaintiffs put the question to him above stated.

It is true, that if a witness state facts in his testimony which make against the party calling him, that party may contradict him as to facts which are material evidence in the cause, by the introduction of other witnesses; for the object of the additional evidence is not to impeach the first witness, but to prove material facts in the cause, the impeachment of his credit being merely incidental and

consequential.    2 Phill. Ev. by Cowan, Hill & Edwards, 982–983.
But it is a well-settled rule, that a party shall not be permitted to
introduce general evidence for the purpose of discrediting his own
witness.   Ib.   This appears to have been the object of the question
under consideration, to show that the witness was under the bias of
interest in the suit ; and, therefore, that his testimony was unworthy
of credit.   It comes within the principle forbidding general evi-
dence by a party to discredit his own witness; and that can no
more be done by a re-examination of the witness himself, than by
the introduction of general evidence to prove his discredit.

We think, therefore, that this question was properly rejected.

The third error assigned is, the admission of an instrument of
writing offered in evidence by the defendant, purporting to be a
receipt or bill of sale, executed in the year 1818, by one Portlock
to Archibald Fairly, under whom the defendant claimed title, for a
slave named Nancy, the mother of part of the slaves in controversy.
This instrument was offered in evidence, as a deed more than thirty
years old, without proof except the following : the clerk of the
Court of Probates of the county testified, that Archibald Fairly
offered the instrument for record in his office shortly after the death
of Margaret Fairly, and it was recorded.   The instrument also has
a written entry upon it by the clerk, showing that it was filed and
recorded in his office in July, 1853.   James Fairly testified, that
at and before the death of his father Archibald Fairly, and since
his mother's death, sixteen or seventeen years previously, his
father's papers were kept in a trunk of which Margaret Fairly
kept the key, and that she kept her papers there also, all the papers
being kept together in the trunk ; that she had access to the trunk,
and could read and write, and they always lived together, but
witness never heard of her claiming any of the slaves, which were
in his father's possession, and he hired them out and received the
hire ; that since the death of witness's mother, about eighteen years
previously, Margaret Fairly superintended the domestic concerns
of his father's family ; that witness first saw the instrument about
eighteen years previously, and it was found in the trunk above
mentioned after his father's death.   Upon this evidence, the court
permitted the instrument to be read in evidence against the objec-
tion of the plaintiffs.

The general rule is, " that an instrument thirty years old may be admitted in evidence, without proof of its execution; and such an instrument is said to prove itself." 2 Phill. Ev. (Cowen, Hill & Edwards) 475. But it is not sufficient for this purpose, that the instrument merely *bears date* thirty years before the time of its production. It is necessary to show that it *has been in existence* for that period of time; and that may be done, not only by evidence of its execution, by the maker, or of its possession by the party claiming under it for that period, but by circumstances creating the presumption of such existence. *Robinson* v. *Craig*, 1 Hill (S. C.), 389; 2 Phill. Ev. 478, notes. And it has been held, that possession of the property in controversy for thirty years, is presumptive evidence of the existence, for that length of time, of a deed produced and purporting to convey the property, if its date does not rebut the presumption. Ib., and *Jackson* v. *Laraway*, 3 John. Cas. 283. So the handwriting of certificates of acknowledgment, indorsed upon the instrument, though unofficial, may be proved, and will be *prima facie* sufficient to show its existence at the date of the certificates. *Carhampton's Lessee* v. *Carhampton*, 1 Irish T. R. 567; *Jackson* v. *Laraway, supra.*

But where possession of the property for thirty years, corresponding with the deed, is not shown, and the existence of the instrument for that period is not otherwise established, it is incumbent on the party offering it, to prove its execution. 2 Phill. Ev. 479, 480.

Here there is no sufficient evidence of the possession of the slave by Archibald Fairly for the time required. There is no proof of the existence of the instrument for the period of thirty years, the evidence tending only to show that it was first seen by the witness James Fairly, about eighteen years before the trial. It is not clearly shown to have been deposited among the papers claimed as the exclusive property of Archibald, nor that it was in his keeping or under his control for the requisite length of time. It does not appear to have been placed in any legal repository, as an evidence of title in Archibald during the lifetime of Margaret Fairly, nor are there any certificates of execution upon it or handwritings of witnesses proved, showing its execution. On the contrary, it appears not to have been treated as a proper muniment of title by

Archibald Fairly, until the recent period of his sister's death, nor does it clearly and satisfactorily appear, that it was really in his keeping, or under his control, whilst it remained in the trunk which was in her possession and under her control.

We think, therefore, that the evidence was not sufficient to bring the instrument within the rule admitting ancient instruments as evidence, and that it should not have been admitted.

The fourth assignment applies to certain instructions asked in behalf of the plaintiffs, and refused. We will consider them in their order.

The twelfth instruction is as follows: "If the slave Nancy was purchased by Archibald Fairly as the agent of Margaret and with her money and for her, and if he took the bill of sale in his own name and without her consent, it was a fraud upon her rights; and in contemplation of law, he held the negro as a trustee for her, and if he delivered the possession of the negro to her, then her title was complete."

There was evidence on the part of the plaintiffs very clearly tending to show, that the slave named was purchased with the money of Margaret and for her, and that the slave was delivered to her, by Archibald Fairly as her property. If the jury were satisfied of these facts from the evidence, it is very clear that it was no objection to her title that the bill of sale was taken in his name; for the slave having been purchased with her means and for her, he held the naked legal title as trustee or agent for her, and she or her administrators had the right to sue for and recover the slave if in his possession. *Mitchell* v. *Mitchell*, 35 Miss. 108, and cases there cited. But if he delivered possession of the slave to Margaret, as the instruction states, and as the evidence warranted the jury in believing, it is clear that her title was thereby made complete. The instruction, in either aspect, was clearly correct as a legal proposition, and was directly pertinent to the evidence, and should have been given.

The thirteenth and fifteenth instructions are as follows: 13th. " That in order to convey the title to negro property, no instrument of writing is necessary; and if Margaret Fairly had the equitable interest in the slave Nancy, and if possession was by Archibald Fairly conveyed to her, and if she exercised acts of ownership over

her, then the jury may presume a legal conveyance by Archibald to Margaret." 15th. "If the jury believe from the evidence, that Archibald Fairly, after the execution of the bill of sale by Portlock to him, conveyed the slave mentioned therein to Margaret, without writing, then the title became vested in Margaret, and the plaintiffs are entitled to recover, unless it be shown that she subsequently parted with the title."

These propositions were clearly correct, both with reference to the evidence before the jury, and the general rules of law, and should have been given.

The next assignment is based upon the instructions granted at the instance of the defendant.

The 2d is, " that if the jury believe from the evidence that the deed from Portlock to Archibald conveyed to him the legal title, and that he held possession of said slave Nancy and her increase up to the time of his death, the jury should find for the defendant."

This is erroneous in two respects. 1st. In leaving it to the jury · to determine whether a legal title was conveyed to Archibald, allowing them to determine that it was an absolute legal title; and 2d, in stating that, if he held the legal title, and held possession of the slaves, he was entitled to the property. The evidence, as above stated, tended strongly to show, that he purchased the slave for Margaret, and with her means, and took the conveyance in his own name. If so, he held the mere naked, legal title in his name, the true and beneficial interest and ownership being in Margaret; and in order to divest her of her interest and acquire title in himself, by means of the conveyance being in his name, and of his holding possession of the slaves, it was necessary that his possession should have been *accompanied by a claim of property in himself* against Margaret, and for a period sufficient to bar the title of Margaret by the Statute of Limitations. This was especially proper to be stated in the instruction, as the evidence tended to show that the slaves, though in the possession of Archibald to a certain extent, were not claimed by him as his property, but were admitted by him to belong to his sister.

The instruction was, therefore, erroneous, and should have been refused.

The 3d instruction is in substance, that the deed from Portlock to Archibald Fairly conveyed the legal title in the slave to him, and vested the property in him and in his children, after the division of the slaves by him among them, unless some conveyance from him was shown. This was erroneous upon the evidence before the jury. For if, as the evidence tended to show, the slave was purchased by him with the money of Margaret, and for her, and the title was merely taken in his name as her agent, he acquired no substantial property in the slave, in his own right, and she was entitled to recover it from him and from his donees, without any conveyance or delivery of possession to her, for the reason above stated. But the instruction is further erroneous, in holding the idea that the legal title of Archibald could not be divested, without a "*conveyance*," by deed or other writing; for that appears to be the import of the instruction. It was at least well calculated to make the impression that such a "conveyance" was necessary; and in that respect it is erroneous, and should not have been given.

The 8th instruction states in substance, that if Archibald controlled, hired, and received the wages of the slaves, with the knowledge and consent of Margaret, these are circumstances going to prove title in him, from which the jury would be authorized to find for the defendant.

This was erroneous. If Archibald controlled, hired, and received the wages of the slaves, with the knowledge and consent of Margaret, *and claiming to do so in his own right*, with her knowledge, the instruction might have been proper. But if he did these acts as the agent of Margaret, as the evidence warranted the jury in believing, the instruction was manifestly wrong. As it stands, and considered with reference to the evidence tending to show that he was acting as her agent in the matter, it appears to be liable to the further objection of instructing the jury upon the weight of evidence.

The 10th instruction directed the jury, that the recording of a deed for slaves is of itself no evidence of fraud. The 14th instruction asked in behalf of the plaintiffs was upon the same point. Both instructions should have been refused. The recording of the deed for the slave was a circumstance to be considered by the jury,

in connection with all the other facts shown in evidence, and to be weighed by them in determining the question of the *bona fides* of Archibald Fairly's title; and it was not a matter which the court was authorized to say whether it was evidence of frand or not.

The 11th instruction is also erroneous. It instructs the jury that John Fairly was as much interested in the suit as the defendant, and that that interest should be taken into consideration in weighing his testimony. This point has already been considered upon the first assignment of error.

The last error assigned is, that the verdict was contrary to the evidence. As the judgment will be reversed, and the evidence will be again submitted to a jury, upon a new trial, we do not consider it proper to express an opinion upon this point at this time.

Let the judgment be reversed, and the cause remanded for a new trial.